**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**


**CUNNINGHAM ENERGY LLC**,
a West Virginia limited liability company,

        Plaintiff,

    v.                              **Civil Action No. 5:13-CV-78
(BAILEY)**

**RIDGETOP CAPITAL II, LP**,
a West Virginia limited partnership,

        Defendant.


**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION
FOR PARTIAL DISMISSAL OF DEFENDANT'S AMENDED COUNTERCLAIMS**

      Presently pending before this Court are (1) Plaintiff Cunningham Energy LLC's

Motion for [Partial] Summary Judgment **[Doc. 39]**; (2) Defendant Ridgetop Capital II, LP's

Motion for [Partial] Summary Judgment **[Doc. 41]**; and (3) Plaintiff's Motion for Partial

Dismissal of Defendant's Amended Counterclaim **[Doc. 61]**.

      On June 2, 2014, the parties filed their cross-motions for summary judgment, both

of which are properly styled as motions for partial summary judgment.[1]  Responses [Docs.

47, 48] were filed on June 23, 2014, and Replies [Docs. 56, 55] on July 7, 2014.

      Plaintiff filed its Motion for Partial Dismissal of Defendant's Amended Counterclaim

on July 17, 2014.  Defendant filed its Response [Doc. 65] on August 4, 2014, and plaintiff

filed its Reply [Doc. 66] on August 12, 2014.

_____

[1] *See* section II, *infra.*

The foregoing motions are ripe for decision. For the reasons set forth below, the parties' cross-motions for partial summary judgment will be **GRANTED IN PART** and **DENIED IN PART**, and plaintiff's Motion for Partial Dismissal of Defendant's Amended Counterclaim will be **GRANTED**.

## I.    Background

This case arises from a pair of oil and gas leases ("the Leases") executed by plaintiff-lessee Cunningham Energy, an independent producer of oil and gas based in Charleston, West Virginia, and defendant-lessor Ridgetop Capital, the owner of certain mineral interests located in Tyler County, West Virginia. The leased properties are two non-adjacent parcels of approximately 87 and 104 acres, both situated atop the Marcellus Shale ("the Tracts"). The parties executed the Leases on June 22, 2011 and August 1, 2011, respectively. [Docs. 39-1 & 39-3 at 2].

In contrast to a traditional oil and gas lease, in which the lessee tenders a nominal initial consideration and the lessor's profit depends upon production and attendant royalties, *see* 2 Summers Oil & Gas § 16.2 (3d ed.) (describing traditional oil and gas lease profit structure), plaintiff paid defendant $382,100 for the Leases at signing in accord with the following provision:

> Bonus and Delay Rental Payments.  (a)  Primary Term:  Lessee agrees to pay as Delay Rental, the rate of Four Hundred Dollars ($400.00) per net mineral acre owned by Lessor under this agreement per year, *paid up.*

[Docs. 39-1 & 39-3 at 3] (emphasis added).

## A.      The Drilling Commitment

A "Special Provisions" addendum, contained in each of the Leases, sets forth the following express condition ("the Commitment") which lies at the heart of the parties' dispute:

> DRILLING COMMITMENT:   Lessee hereby commits to drill two (2) 'horizontal' Marcellus Shale wells within the first twenty four (24) months of the effective date of this agreement, and upon their completion, if it appears that gas is present in commercial quantities, Lessee commits to drill two (2) additional horizontal wells within twelve (12) months of the completion of the initial wells drilled.

*Id.*[2] at 9.  The "Special Provisions" addendum does not define "drill."  *See id.*  The body of the Leases, however, contains the following definition of "operations":

> "Operations" includes any of the following . . . :  (i) drilling (which includes applying for permits, the commencement of clearing operations on or adjacent to the well site area such as the removal of trees, the construction of access roads in preparation for drilling, the delivery of heavy equipment, and the use of bona fide good faith continuing efforts to diligently prepare the physical well site area as required prior to the commencement of actual drilling activities[)] . . .

*Id.* at 7.

In order to ensure adequate well spacing, a single horizontal well pad, from which multiple horizontal wells may be run, is generally built on approximately 640 acres of land.

---

[2] As the two leases are identical, "*id.*" is used to refer to both documents.

*See* [Doc. 42-7 at 24:23–24]; [Doc. 42-3 at 43:6–44:2]. At the time the Leases were executed, both plaintiff and defendant intended that plaintiff would acquire additional acreage adjacent to the Tracts to create an appropriately sized unit, as the Tracts comprised only 191 acres; the Leases themselves, however, contain no language memorializing that intent. *See* [Doc. 42-3 at 42:5–8] ("Because when we had signed all the leases, the commitment was to apply to the entire block and not 190 acres[.]"); [Doc. 42-7 at 25:2–8] ("[T]hey were going . . . to acquire additional leases on surrounding acreage and then drill . . . incorporating or unitizing my acreage as part of the larger units that they were in the process of acquiring."). Plaintiff was subsequently unable to acquire additional surrounding acreage, as much of the property surrounding the Tracts was already leased or held by production.[3] *See* [Doc. 42-6 at 29:8–19]; [Doc. 42-8 at 3].

At some point prior to August 22, 2013, having been unable to acquire additional acreage surrounding the Tracts, plaintiff approached defendant seeking either an extension of time in which to satisfy the Commitment or rescission of the Commitment altogether. [Doc. 42-8 at 3] (inquiring, on August 22, 2013, whether defendant had "come to any conclusion [on] our offer on the lease amendment"); [Doc. 42-3 at 41:9–42:12] (describing the negotiations). When defendant refused to extend or remove the Commitment, plaintiff responded that in order to "hold the acreage," plaintiff would have "no choice" but to "go ahead and permit 2 Marcellus Horizontal wells that we will drill[,] very short horizontals . . . on these two tracts[.]" *See* [Doc. 42-8 at 2–3].

Plaintiff did not begin preparing to drill the Tracts until March 26, 2013, when it hired an engineering firm to prepare its required drilling permit applications for submission to the

---

[3] The parties' differing explanations of this failure are irrelevant.

West Virginia Department of Environmental Protection ("WVDEP"). *See* [Doc. 39-5 at 2] (engineering firm invoice for work beginning March 26, 2013); *see also* W.Va. Code § 22-6A-7(a) (requiring permit prior to commencement of well work). In May 2013, plaintiff retained a surveying firm to survey, map, and stake the physical well locations on the leased property. *See* [Doc. 39-6] (surveyor invoices for work beginning May 2013).

Plaintiff submitted its permit application for the first leased tract on June 14, 2013; however, on June 16, 2014, the WVDEP informed plaintiff that the application was being returned, as it was missing the performance bond required by the West Virginia Natural Gas Horizontal Well Control Act. [Doc. 47-4 at 6]; *see also* W.Va. Code § 22-6A-7(g) (requiring bond). Plaintiff submitted its permit application for the second leased tract on or about July 12, 2013,[4] once again without providing the required bond; that application was also returned to plaintiff. *See* [Doc. 47-4 at 7]; [Doc. 47-1 at 4].

On July 1, 2013, defendant sent plaintiff a notice of forfeiture indicating that defendant was cancelling the June 22, 2011 lease. *See* [Doc. 48-1]. Plaintiff states it has never received a similar notice concerning the August 1, 2011 lease. [Doc. 56. at 4]. Defendant's position, however, is that it had the right to declare both Leases forfeit based upon plaintiff's failure to satisfy the Commitment. *See* [Doc. 42 at 19].

---

[4] The precise date the second application was filed is not clear from the record. Plaintiff's briefing represents it was filed on June 26, 2013, *see* [Doc. 40 at 4], but the application documents themselves state it was filed on July 19, 2013. *See* [Doc. 39-9 at 24]. However, a July 12, 2013 email from plaintiff to the WVDEP suggests that plaintiff sent the application prior to that date. *See* [Doc. 47-4 at 7] ("I understand that you received the permit applications . . .").

### B.     The Top Lease

On July 19, 2012—more than one month prior to the August 23, 2013 conclusion of negotiations between plaintiff and defendant concerning the Commitment—defendant executed a "top lease" leasing the Tracts to production company JB Exploration I, LLC, under which JB Exploration would acquire defendant's mineral interest in the Tracts on June 24, 2013.  *See* [Doc. 38-11 at 2].  Defendant recorded a memorandum evidencing the top lease in the Tyler County Clerk's Office.  *See id.*  The July 19, 2012 top lease referenced in the memorandum, however, was not produced in discovery and has not been provided to this Court; the only document evidencing the top lease is the recorded memorandum.

The Leases between plaintiff and defendant contain the following provision governing top leases:

> RIGHT OF FIRST REFUSAL: If at any time within 30 days of the expiration
> of the Lease's primary term . . . Lessor should receive a bona fide,
> acceptable offer to grant an additional lease ("Top Lease") for all or part of
> the subject premises, Lessor shall grant Lessee the option of meeting the
> terms and conditions of said offer. . . .  Any Top Lease granted by Lessor in
> violation of this provision shall be null and void.

[Doc. 39-1 & 39-3 at 3].  Defendant neither informed plaintiff of the top lease nor offered plaintiff the option of meeting the terms and conditions of JB Exploration's offer.

Defendant represents that defendant and JB Exploration "mutually agreed to terminate" the July 19, 2012 top lease.  [Doc. 47 at 10].  On September 20, 2013, however, defendant and JB Exploration executed a second top lease, which states that defendant

"had received a 20% down payment in the amount of $124,185.50 for leasing JB [the Tracts] on July 19, 2012." [Doc. 39-12 at 2]. Again, defendant neither informed plaintiff of the top lease nor extended plaintiff a right of first refusal.

## II. Procedural History

Plaintiff initiated this action on June 24, 2013 by filing its Complaint [Doc. 1], invoking this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. The Complaint seeks a declaratory judgment that the Leases are valid and in full legal effect (Count I); that plaintiff satisfied the Commitment by submitting drilling permit applications for the Tracts (Count II); and that any top lease granted by defendant is void (Count III). On August 23, 2013, defendant filed its Counterclaim [Doc. 14 at 8–19] against plaintiff, alleging breach of contract (Count I); fraud (Count II); negligent misrepresentation (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); unjust enrichment (Count V); and slander of title (Count VIII). Defendant also seeks a declaratory judgment that plaintiff failed to satisfy the Commitment (Count VI) and to quiet title to the mineral rights associated with the Leases (Count VII).

The instant cross-motions for partial summary judgment followed. While both are styled as motions for summary judgment, they are properly termed motions for partial summary judgment, as each address (or impliedly address) only (1) plaintiff's Complaint; (2) defendant's counterclaim for breach of contract; and (3) defendant's counterclaims for declaratory judgment and to quiet title.

On July 8, 2014, with the cross-motions for partial summary judgment pending, defendant filed its Amended Counterclaim [Doc. 59 at 8–22] pursuant to this Court's Order [Doc. 58] granting leave for defendant to do so. In addition to the counterclaims recited

7

above, the Amended Counterclaim sets forth two additional claims for fraud (Count IX) and abuse of process (Count X). The instant partial motion to dismiss followed.

### III. Legal Standard

#### A. Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Thus, a summary judgment motion should be granted if the nonmovant fails to make a showing sufficient to establish the existence of an essential element of his claim or defense upon which he bears the burden of proof. *Celotex*, 477 U.S. at 323. That is, once the movant shows an absence of evidence on one such element, the nonmovant must then come forward with evidence demonstrating there is indeed a genuine issue for trial. *Id.* at 323–24. The existence of a mere scintilla of evidence supporting the nonmovant's position is insufficient to create a genuine issue; rather, there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

#### B. Motion to Dismiss

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court accepts all well-pled facts in the complaint as true and construes those facts in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79; *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008). Legal conclusions, recitations of the elements of a cause of action, and bare

assertions devoid of further factual enhancement do not constitute well-pled facts for Rule 12(b)(6) purposes.  *See Iqbal*, 556 U.S. at 678.

Ultimately, a complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  Facial plausibility is established where the facts alleged in the complaint "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This context-specific test does not require "detailed factual allegations," but the complaint must produce an inference of liability strong enough to nudge the plaintiff's claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 555, 570.  A court ruling on a motion to dismiss may consider any documents integral to and relied on in the complaint, regardless of whether those documents are actually attached to the complaint.  *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

## IV.   Discussion

This Court will first discuss the parties' cross-motions for summary judgment, followed by plaintiff's motion seeking partial dismissal of defendant's counterclaims.  With respect to the cross-motions for summary judgment, this Court finds that (1) plaintiff failed to satisfy the Commitment; (2) the Leases nevertheless remain valid; and (3) the top lease between defendant and JB Exploration is void.  These three findings dispose of all the claims at issue in the cross-motions.

With respect to plaintiff's motion for partial dismissal of the Amended Counterclaim, this Court finds that dismissal is proper as to Counts IV (breach of the implied covenant of good faith and fair dealing), V (unjust enrichment), and X (abuse of process), as all three fail to state a claim upon which relief may be granted.

A.    **Cross-Motions for Partial Summary Judgment**

i.    **Satisfaction of the Commitment**

The question whether plaintiff satisfied the Commitment, the issue at the heart of this case, turns upon the meaning of the word "drill" as used in the Commitment. Plaintiff argues that the definition of "drilling" contained within the definition of "operations" applies to the word "drill" in the Commitment, and therefore that plaintiff satisfied the Commitment by applying for permits[5] to drill two wells on each of the two Tracts. Defendant responds that the word "drill" in the Commitment required plaintiff to bore holes into the ground to the depth of the Marcellus Shale strata, not merely to apply for permits, and that plaintiff breached the leases by failing to do so within twenty-four months. This Court agrees with defendant.

As oil and gas leases are contracts, they are construed in accord with general canons of contract interpretation. *See, e.g.*, *Estate of Tawney v. Columbia Natural Res., L.L.C.*, 219 W.Va. 266, 272, 633 S.E.2d 22, 28 (2006) (construing an oil and gas lease). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." *Id.* (quoting Syl. Pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E. 2d 626 (1962)). Unambiguous contractual language must be construed according to its plain and ordinary meaning. *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995). "The mere fact that parties do

---

[5] In its Amended Counterclaim, defendant alleges that plaintiff did not in fact file the permit applications. *See* [Doc. 59 at PP 60–70] (Count IX: Fraud). As resolution of the parties' cross-motions does not depend upon whether or not plaintiff filed the permit applications, this Court assumes without deciding that plaintiff did so for purposes of this Order.

not agree to the construction of a contract does not render it ambiguous"; the question whether a contract is ambiguous is a question of law for the court. Syl. Pt. 1, **Berkeley Co. Pub. Serv. Dist. v. Vitro Corp.**, 152 W.Va. 252, 162 S.E.2d 189 (1968).

Contract language is ambiguous when, "in light of the surrounding circumstances and after applying the established rules of construction," **Williams v. Precision Coil**, 194 W.Va 52, 65 n.23, 459 S.E.2d 329, 342 n.23 (1995), it is "reasonably susceptible of two different meanings." **Id.** (quoting **Payne**, 195 W.Va. at 507). Where an ambiguity exists, parol evidence is admissible to resolve the ambiguity by showing "the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently." Syl. Pt. 1, **Watson v. Buckhannon River Coal Co.**, 95 W.Va. 164, 120 S.E. 390 (1923).

Applying the established rules of construction, this Court finds that the word "drill" as used in the Commitment unambiguously indicates that plaintiff was required to bore holes into the ground, not merely to apply for permits. Plaintiff's argument that the subdefinition of "drilling" contained in the definition of "operations" applies throughout the lease is unpersuasive, as applying the "operations" subdefinition in that fashion renders other language in the Leases redundant. *See, e.g.*, **Moore v. Johnson Serv. Co.**, 158 W.Va. 808, 817, 219 S.E.2d 314, 321 (1975) ("[W]ords or clauses are not to be treated as meaningless or discarded if any reasonable meaning consistent with other parts of the contract can be given them."). Specifically, paragraph 5 of the Leases distinguishes between a "well which is commenced" and a "well which is . . . drilled." [Docs. 39-1 & 39-3

11

at 4].  Applying the subdefinition of "drilling" found in the definition of "operations" to the word "drilled" in paragraph 5 would make the word "commenced" unnecessary.

The Leases do not define "commenced."  As plaintiff points out, while "commence" has not been defined under West Virginia law, Black's Law Dictionary defines it as "[t]o initiate by performing the first act [or] [t]o institute or start."  Black's Law Dictionary 243 (5th ed. 1979).  By that definition, applying for a permit is "commencement" of a well, as it is certainly one of the first acts—if not the very first act—taken in preparing to drill.  *See* W.Va. Code § 22-6A-7(a) (prohibiting any well-site work involving the disturbance of land prior to issuance of a permit).  Thus, if the word "drilled" in paragraph 5 is defined to include "applying for permits"—as it must, under plaintiff's view—there would be no distinction between a well "commenced" and a well "drilled."

In contrast, by giving "drilled" in paragraph 5 its plain and ordinary meaning, rather than applying the subdefinition of "drilling" found in the definition of "operations," the word "commenced" in paragraph 5 is given full effect.  The Oxford English Dictionary defines "drill" as "to perforate with or as with a drill or similar tool; to make or bore (a hole, etc.) by drilling."[6]  Where "drilled" is understood to mean that a hole be bored by drilling, there is a clear distinction between a well "commenced," meaning that preparatory activities not involving the boring of a hole have begun, and a well "drilled," meaning that a hole has actually been bored into the ground.

Plaintiff points to **Murphy v. Amoco Production Company**, 590 F. Supp. 455, 458 (D. N.D. 1984), as containing "the most common construction of 'drilling.'"  [Doc. 40 at 9].  The **Murphy** court, however, examined the definition of "drilling operations," not the

---

[6] OED Online, Oxford University Press (June 2014), http://www.oed.com/view/Entry/577 34?result=8&rskey=ZDxswb&.

definition of "drilling." **Murphy**, 590 F. Supp. at 458 (distinguishing between "drilling operations" and "actual drilling"). "Drilling operations" is a term of art in oil and gas leases: while "'drilling' requires the drill to actually penetrate the ground and bore a hole, . . . 'drilling operations' require work preparatory to drilling, the capability to drill, and good faith intent to drill and complete the well." **Anderson v. Hess Corp.**, 649 F.3d 891, 894 (8th Cir. 2011), *affirming* 733 F. Supp. 2d 1100 (D. N.D. 2010) (citing Williams & Meyers, Manual of Oil and Gas Terms (2009) ("Drilling is the act of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities.")); *accord* **Humphrys v. Skelly Oil Co.**, 83 F.2d 989, 992 (5th Cir. 1936) (rejecting contention that "drilling operations" require a hole be bored).

This Court agrees with defendant that the subdefinition of "drilling" found in the definition of the word "operations" is meant to apply only with reference to "operations." As in **Murphy**, courts commonly distinguish between drilling and activities conducted in preparation for drilling in discussing whether a lessee has conducted "operations" sufficient to hold the lease past the primary term. Limiting the application of the "drilling" subdefinition to the word "operations" thus does not, as plaintiff suggests, treat the subdefinition as meaningless. On the contrary, the subdefinition remains crucial in determining whether, after expiration of the primary term of the Leases, the lessee remains engaged in activities other than production of gas itself sufficient to retain its leasehold. *See* [Docs 39-1 & 39-3 at 2] (stating the Leases shall remain in force, following the primary term, "as long thereafter as any leased minerals are produced in commercial quantities from the Premises. Or operations are underway on the Premises. . . .").

Plaintiff objects to this conclusion by urging that it would be impossible to drill the number of wells contemplated by the Commitment on only 191 acres of land. "Evidence of custom[,]" however, "is inadmissible to add new stipulations to or engraft them upon, an agreement upon its face complete, where the agreement, as it stands, is plain and unambiguous." *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 497, 128 S.E.2d 626, 635 (1962). The Commitment is contained in each of the Leases and each Lease unambiguously states that plaintiff "commits to drill two (2) . . . wells" within the first 24 months following execution of the Leases. The Leases contain no language stating that the Commitment will take effect only in the event plaintiff successfully obtains more acreage or restricting operation of the Commitment in the event plaintiff is unable to do so, and this Court cannot unilaterally add such language to the parties' contracts. *See id.*

Plaintiff's final contention on this point is that defendant's "acceptance of delay rental payments, advanced-in-full for the five-year term, serve[d] as full satisfaction and compensation for any claimed delay" and as "assent[] to the possibility there would be no production during the primary term[,]" "eviscerating any implied covenant for diligent operation." [Doc. 40 at 14, 17]. This argument must be rejected. First, it is irrelevant: the issue is whether plaintiff satisfied the Commitment, which creates an express obligation to drill the Tracts independent of any implied covenant for diligent operation. Second (and relatedly), reading the Leases to require nothing more than up-front payment of delay rentals to hold them for the primary term reads the Commitment out of existence. The Commitment contains no language indicating it could be abrogated by up-front payment of delay rentals, and cannot be read as though it does. *See, e.g.*, Syl. Pt. 3, *Moore v.*

*Johnson Serv. Co.*, 158 W.Va. 808, 219 S.E.2d 315 (1975) ("[S]pecific words or clauses of an agreement are not to be treated as meaningless, or to be discarded.").

Third, it is the opinion of this Court that the paid-up "delay rentals" are properly categorized not as delay rentals, but as bonus payments. A delay rental is a periodic payment made by a gas lessee to postpone exploration during the primary term. *Enerquest Oil & Gas, LLC v. Plains Exploration & Prod. Co., EOG*, 981 F. Supp. 2d 575, 602 (W.D. Tex. 2013). A bonus payment, by contrast, is the cash consideration paid or agreed to be paid to induce execution of the lease. *Id.* "The defining characteristic of a delay rental, as opposed to a bonus, is that it is an *alternative* to drilling. In other words, . . . a lessee may avoid paying delay rentals by drilling." *Id.* at 602–03 (emphasis in original). Whether a lease labels a particular payment a "delay rental" or a "bonus" is not controlling in categorizing the payment. *Id.* at 602.

Here, the Leases use both labels: the payment plaintiff made to defendant is termed "Bonus and Delay Rental." *See supra* section I n.1. Plaintiff was obligated by the Leases to pay the "bonus and delay rental" at signing. The Leases contain no clause indicating that plaintiff must either pay delay rentals or drill within the primary term to maintain the lease, nor do the Leases make any reference to delay rentals other than in the "bonus and delay rental" provision itself. As the up-front consideration paid by plaintiff has all the hallmarks of a bonus payment and lacks those of a delay rental, this Court concludes that the payment was in fact a bonus—and thus had nothing to do with payment in lieu of drilling. *See id.* at 605 (citing 3 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 28.6 ("A paid-up lease does not contain a drilling clause, and an additional consideration provided for in such a lease is not a delay rental.")).

This Court therefore concludes that plaintiff failed to satisfy the Commitment. The Commitment required that plaintiff drill—penetrate the ground with a drill bit and bore holes through which gas could be produced—two horizontal wells on each of the two Tracts within twenty-four months of the Leases' execution. As plaintiff did not do so, defendant is entitled to a declaration that plaintiff failed to satisfy the Commitment, and any damages flowing from plaintiff's breach.

### ii.    Forfeiture of the Leases

Having concluded that plaintiff breached the Commitment, this Court turns to the question whether defendant properly declared the Leases forfeit based upon that breach. Resolution of this question is necessary to settle both plaintiff's request for a declaratory judgment that the Leases remain valid and defendant's request for a declaratory judgment quieting title to the mineral interests. Unfortunately, the parties' briefing neglects this issue. Plaintiff briefly argues that a breach of the Commitment cannot give rise to a right to terminate the Leases because the Leases do not contain a termination or forfeiture clause and the Commitment itself does not indicate that breach will work a forfeiture. Defendant fails to address this question at all, merely assuming throughout that breach of the Commitment renders the Leases "null and void." *See, e.g.*, [Doc. 42 at 13].

As explained below, under West Virginia law, an oil and gas lessor must expressly reserve the power to declare the lease forfeit in the event the lessee breaches an express condition. Consequently, this Court finds that defendant had no power to declare the Leases forfeited based upon plaintiff's breach. The Leases therefore remain valid.

As the West Virginia Supreme Court has stated:

The right to forfeit must be clearly stipulated for in terms, else it does not exist. Every breach of a covenant or condition does not confer it upon the injured party. It never does, unless it is so provided in the instrument. Such breaches are usually compensable in damages . . . . The broken covenant or condition relied upon for forfeiture must be found not only in the instrument, by clear and definite expression, but also within the forfeiture clause, by such expression.

*Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W.Va. 310, 314–15, 288 S.E.2d 139, 142 (1982) (quoting *Peerless Carbon Black Co. v. Gillespie*, 87 W.Va. 441, 105 S.E. 517 (1920)). *See also Gillespie*, 105 S.E. at 524 ("Forfeiture is not essential to the existence of the obligation to which it relates."). This view accords with the general rule. *See* 3 Summers Oil & Gas § 21.1 (3d ed.) ("An oil and gas lessor may terminate the lease for breach of an express or implied covenant by the lessee through a declaration of forfeiture, *if that power is expressly reserved in the lease*, and may enforce the forfeiture . . . by an action . . . to quiet title.") (emphasis added).

Just last year, the Fourth Circuit, applying West Virginia law and quoting *Bethlehem Steel* and *Gillespie*, rejected a lessor's claim that a lessee forfeited its lease by failing to tender flat-rate rental payments as expressly required by the lease. *Wellman v. Bobcat Oil & Gas, Inc.*, 524 Fed. Appx. 26, 32–33 (4th Cir. May 7, 2013). The Court found that whether or not the lessee had in fact breached the express payment provision, the absence of an express forfeiture provision was outcome-determinative:

In this case, the Lease does not contain a clear and unequivocal stipulation that the lessee's failure to make quarterly rental payments will result in

forfeiture. Accordingly, even if we credited the [lessor's] allegations regarding the single missed payment or late payments that correspondingly followed, the evidence presented is far from sufficient to justify cancelling the Lease. Therefore, under these facts, the Lease remains valid.

*Id.* at 33 (internal quotations and citations omitted).

While this Court has uncovered no West Virginia case law implying a power of forfeiture, perhaps unsurprisingly in light of the decisions previously cited, this Court notes that other jurisdictions have done so on the theory that the breached covenant is an implied condition precedent. *See, e.g.*, ***Hall v. Auger***, 256 P. 232, 233–35 (Cal. Dist. Ct. App. 1927) (implying a power of forfeiture where lessee failed to begin drilling within sixty days, as expressly required by the lease). Yet even if that theory were applicable in West Virginia, it would not yield a different result, as the key to its propriety is the absence of consideration for the lease other than future royalties. *See **id.*** (reasoning that because royalties were the primary consideration for the lease, the drilling covenant was in fact an implied condition precedent). Here, plaintiff tendered a substantial initial consideration for the Leases: the $382,100 bonus payment.

Accordingly, this Court finds that the Leases remain valid and in effect. Although plaintiff's breach of the Commitment supports defendant's claim for damages, no express forfeiture provision gave defendant the power to declare the Leases forfeit in the event plaintiff breached the Commitment.

### iii.    Validity of the Top Lease

Having found that the Leases remain valid, there remains the matter of the top lease executed between defendant and JB Exploration. Because the Leases remain in effect,

18

this Court finds it unnecessary to consider whether the July 19, 2012 memorandum evidences a valid top lease in resolving this issue. The September 20, 2013 lease is the presently active lease agreement between defendant and JB Exploration. Defendant admits that it gave plaintiff neither notice of the September 20, 2013 top lease nor right of first refusal, both of which are required by the Leases' top-leasing provision. The September 20, 2013 top lease was therefore granted in violation of the top-leasing provision, and in accord with the Leases' terms, is null and void. *See* [Doc. 39-1 & 39-3 at 3] (top leases granted in violation of the provision "shall be null and void."); *see also St. Luke's United Methodist Church v. CNG Dev. Co.*, 222 W.Va. 185, 187 n.6, 663 S.E.2d 639, 641 n.6 (2008) (stating that top-lessee cannot drill on the property covered by its lease when the original lessee has a valid lease on the same property).

In sum, this Court finds that plaintiff breached the Commitment and that defendant is entitled to its damages flowing from plaintiff's breach. Under West Virginia law, however, defendant lacked the power to declare the Leases forfeit based upon that breach. The Leases therefore remain valid, and the top lease granted by defendant is void pursuant to the Leases' terms. Both parties' motions for partial summary judgment are therefore **GRANTED IN PART** and **DENIED IN PART**.

### B. Plaintiff's Motion for Partial Dismissal of Defendant's Amended Counterclaim

Having disposed of the cross-motions for summary judgment, this Court turns to Plaintiff's Motion for Partial Dismissal of Defendant's Amended Counterclaim. Plaintiff's Motion asks this Court to dismiss three of the Counts set forth in the Amended Counterclaim: (1) Count IV, which alleges breach of the implied covenant of good faith and

fair dealing; (2) Count V, which alleges unjust enrichment; and (3) Count X, which alleges abuse of process.  As explained below, this Court finds that plaintiff's Motion should be **GRANTED** in its entirety.

### i.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Count IV alleges that plaintiff breached the implied covenant of good faith and fair dealing inherent in the Leases when it "acted in bad faith in order to obtain a leasehold on [defendant's] oil and gas rights" by making "false, misleading, and/or inaccurate" statements concerning its intention to drill on the Tracts.  These allegations fail to state a claim for relief under West Virginia law.

Although West Virginia law "implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract," *Stand Energy Corp. v. Columbia Gas Transmission*, 373 F. Supp. 2d 631, 644 (S.D. W.Va. 2005), the West Virginia Supreme Court has "declined to recognize an independent claim for a breach of the common law duty of good faith, and has instead held that such a claim sounds in breach of contract." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love*, 231 W.Va. 577, 587, 746 S.E.2d 568, 578 (2013) (quoting *Corder v. Countrywide Home Loans, Inc.*, 2011 WL 289343, at *3 (S.D. W.Va. Jan. 26, 2011) (unreported)).   Consequently, if defendant's claim is to survive, it must be construed as a breach of contract claim.  *Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*, 2014 WL 3548631  at *7 (N.D. W.Va. July 17, 2014) (Stamp, J.) (slip op.).

Defendant wisely argues that its claim is in fact "a claim for breach of the Leases alleging breach of the implied covenant of good faith and fair dealing as grounds for recovery."  This Court disagrees with defendant, as the facts it pleads in support of its

claim—that plaintiff made false statements in order to induce defendant to execute the Leases—sound in the torts of fraud and negligent misrepresentation, not in breach of contract. An action to recover damages for fraud inducing a contract is not based upon violation of the contract. 37 C.J.S. Fraud § 111. Thus, allegations amounting to a claim that plaintiff fraudulently induced defendant to contract cannot constitute a breach of contract claim. Count IV of defendant's Amended Counterclaim must therefore be **DISMISSED**.

### ii.    Unjust Enrichment

Plaintiff next seeks dismissal of Count V, which alleges that plaintiff was unjustly enriched at defendant's expense by "maintaining a leasehold" on the Tracts without fulfilling the Commitment. Plaintiff urges that as defendant's unjust enrichment claim flows exclusively from plaintiff's breach of the Leases, defendant is limited to its damages for breach of contract. This Court agrees. "An action for unjust enrichment is quasi-contractual in nature and may not be brought in the face of an express contract." ***Bright v. QSP, Inc.***, 20 F.3d 1300, 1306 (4th Cir. 1994) (applying West Virginia law). Defendant's unjust enrichment claim is barred by the existence of the Leases, which are express contracts governing the subject matter of the claim. *See id.* at 1306 (holding that unjust enrichment claim is precluded where subject matter of the claim is "governed by preexisting express contracts"); ***Ash v. Allstate Ins. Co.***, 2013 WL 5676774 at *5 (W.Va. Oct. 18, 2013) (unreported) (affirming dismissal of unjust enrichment claim based upon obligation that "could only arise pursuant to the terms of [the claimant's] insurance contract"). Consequently, Count V of defendant's Amended Counterclaim must be **DISMISSED**.

### iii. Abuse of Process/Malicious Prosecution

Finally, plaintiff moves to dismiss Count X of defendant's Amended Counterclaim, which raises a claim for abuse of process. Specifically, defendant alleges that plaintiff made fraudulent statements to defendant and to this Court, "had no probable or reasonable cause to file its Complaint," "initiated this declaratory judgment action for an ulterior purpose, and intentionally used this proceeding . . . to intimidate, harass, threaten, harm, and injure" defendant. [Doc. 59 at ¶¶ 72–76].

Plaintiff argues that these allegations are too broad and nonspecific to sustain a claim for abuse of process. Defendant responds that its allegations are sufficient to survive dismissal, and in the alternative, that the allegations state a claim for malicious prosecution. This Court finds that defendant has failed to state a claim either for abuse of process or malicious prosecution.

"Generally, abuse of process consists of the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process." *Williamson v. Harden*, 214 W.Va. 77, 80, 585 S.E.2d 369, 372 (2003) (quoting Syl. Pt. 2, *Wayne Cnty. Bank v. Hodges*, 175 W.Va. 723, 338 S.E.2d 202 (1985)). Thus, to state a claim for abuse of process, the claimant must plead both (1) an ulterior purpose, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Sapphire Dev., LLC v. Span USA Inc.*, 120 Fed. Appx. 466, 473 (4th Cir. 2005).

In contrast to an action for malicious prosecution, abuse of process does *not* lie merely "for maliciously causing process to issue"; rather, "there must be proof of a willful and intentional abuse . . . for the accomplishment of some wrongful object." *Harden*, 214

W.Va. at 80 (quoting *Preiser v. MacQueen*, 177 W.Va. 273, 279, 352 S.E.2d 22, 28 (1985)).  The wrongful purpose "usually takes the form of coercion to obtain a collateral advantage not involved in the proceeding . . . by use of the process as a threat." *Preiser*, 177 W.Va. at 279 (internal quotation omitted).

Defendant's allegations are insufficient to state a claim for abuse of process.  Even if its allegation that plaintiff brought this action to "intimidate, harass, threaten, harm, and injure" defendant adequately pleads ulterior purpose, defendant has failed to allege the requisite willful act in the use of process.  Defendant's allegations of fraudulent statements made to the Court do not suffice.  *See Metro Media Ent., LLC v. Steinruck*, 912 F. Supp. 2d 344, 351 (D. Md. 2012) (dismissing a claim for abuse of process where willful act alleged was that plaintiff's "'key allegations . . . used to convince the court to authorize the issuance of the subpoena were false' and designed to 'mislead the court'").

Nor does Count X survive dismissal recast as a claim for malicious prosecution.  A malicious prosecution claim requires a showing that the suit in question (1) was malicious; (2) was without reasonable or probable cause; and (3) terminated favorably to the claimant. *Preiser*, 177 W.Va. at 276.  Although a cause of action for malicious prosecution will lie where only some, but not all, of the claims raised in the suit are malicious and without reasonable cause, *Crowley v. Katleman*, 861 P.2d 1083, 1093–94 (Cal. 1994) (en banc), the suit *as a whole* must terminate in favor of the claimant.  A malicious prosecution claim filed as a counterclaim in a pending civil proceeding is premature.  *See, e.g.*, *Terry v. Genarco, Inc.*, 449 F. Supp. 1015, 1016 (E.D. Va. 1978) (collecting cases);  52 Am. Jur. 2d Malicious Prosecution § 126 (same).  As this Court has yet to render final judgment in this action, defendant's malicious prosecution counterclaim is in haste.  Count X of

defendant's Amended Counterclaim must therefore be **DISMISSED**.

## CONCLUSION

Accordingly, this Court hereby **ORDERS** as follows:

As to the parties' cross-motions for partial summary judgment:

(1)     Plaintiff's Motion is **GRANTED** as to Count I of its Complaint, as the Leases remain valid;

(2)     Defendant's Motion is **DENIED** as to Count VII of its Amended Counterclaim, as the Leases remain valid;

(3)     Defendant's Motion is **GRANTED** as to Count II of plaintiff's Complaint, Count I of defendant's Amended Counterclaim and Count VI of defendant's Amended Counterclaim, as plaintiff breached the Commitment; and

(4)     Plaintiff's Motion is **GRANTED** as to Count III of its Complaint, as the top lease executed by defendant is void.

Plaintiff's Motion for [Partial] Summary Judgment **[Doc. 39]** and defendant's Motion for [Partial] Summary Judgment **[Doc. 41]** are therefore **GRANTED IN PART** and **DENIED IN PART**. Further, Plaintiff's Motion for Partial Dismissal of Defendant's Amended Counterclaims **[Doc. 61]** is hereby **GRANTED**.

It is so **ORDERED**.

The Clerk is directed to transmit a copy of this Order to counsel of record herein.

**DATED:** September 4, 2014.

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE