# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# WHEELING

**CUNNINGHAM ENERGY LLC**,
a West Virginia limited liability company,

        Plaintiff,

        v.                               Civil Action No. 5:13-CV-78
                                                (BAILEY)

**RIDGETOP CAPITAL II, LP**,
a West Virginia limited partnership,

        Defendant.

## ORDER GRANTING PLAINTIFF/COUNTERCLAIM-DEFENDANT CUNNINGHAM ENERGY LLC'S SECOND MOTION FOR SUMMARY JUDGMENT

Presently pending before this Court is Plaintiff/Counterclaim-Defendant Cunningham Energy LLC's Second Motion for Summary Judgment **[Doc. 75]**, which was filed on November 3, 2014. Ridgetop Capital filed a Response [Doc. 82] on November 24, 2014, and Cunningham Energy filed a Reply [Doc. 84] on December 5, 2014.

This Court has reviewed the record and arguments of the parties and, for the reasons set out below, concludes that the plaintiff's Second Motion for Summary Judgment should be **GRANTED.**

## I. Background

This case arises from a pair of oil and gas leases ("the Leases") executed by plaintiff-lessee Cunningham Energy, an independent producer of oil and gas based in Charleston, West Virginia, and defendant-lessor Ridgetop Capital, the owner of certain mineral interests located in Tyler County, West Virginia. The leased properties are two

1

non-adjacent parcels of approximately 87 and 104 acres, both situated atop the Marcellus Shale ("the Tracts"). The parties executed the Leases on June 22, 2011 and August 1, 2011, respectively. [Docs. 39-1 & 39-3 at 2].

In contrast to a traditional oil and gas lease, in which the lessee tenders a nominal initial consideration and the lessor's profit depends upon production and attendant royalties, *see* 2 Summers Oil & Gas § 16.2 (3d ed.) (describing traditional oil and gas lease profit structure), plaintiff paid defendant $382,100 for the Leases at signing in accord with the following provision:

> Bonus and Delay Rental Payments. (a) Primary Term: Lessee agrees to pay as Delay Rental, the rate of Four Hundred Dollars ($400.00) per net mineral acre owned by Lessor under this agreement per year, *paid up.*

[Docs. 39-1 & 39-3 at 3] (emphasis added).

### A. The Drilling Commitment

A "Special Provisions" addendum, contained in each of the Leases, sets forth the following express condition ("the Commitment") which lies at the heart of the parties' dispute:

> DRILLING COMMITMENT: Lessee hereby commits to drill two (2) 'horizontal' Marcellus Shale wells within the first twenty four (24) months of the effective date of this agreement, and upon their completion, if it appears that gas is present in commercial quantities, Lessee commits to drill two (2) additional horizontal wells within twelve (12) months of the completion of the initial wells drilled.

2

*Id.*[1] at 9. The "Special Provisions" addendum does not define "drill." *See id.* The body of the Leases, however, contains the following definition of "operations":

> "Operations" includes any of the following . . . : (i) drilling (which includes applying for permits, the commencement of clearing operations on or adjacent to the well site area such as the removal of trees, the construction of access roads in preparation for drilling, the delivery of heavy equipment, and the use of bona fide good faith continuing efforts to diligently prepare the physical well site area as required prior to the commencement of actual drilling activities[)] . . .

*Id.* at 7.

In order to ensure adequate well spacing, a single horizontal well pad, from which multiple horizontal wells may be run, is generally built on approximately 640 acres of land. *See* [Doc. 42-7 at 24:23–24]; [Doc. 42-3 at 43:6–44:2]. At the time the Leases were executed, both plaintiff and defendant intended that plaintiff would acquire additional acreage adjacent to the Tracts to create an appropriately sized unit, as the Tracts comprised only 191 acres; the Leases themselves, however, contain no language memorializing that intent. *See* [Doc. 42-3 at 42:5–8] ("Because when we had signed all the leases, the commitment was to apply to the entire block and not 190 acres[.]"); [Doc. 42-7 at 25:2–8] ("[T]hey were going . . . to acquire additional leases on surrounding acreage and then drill . . . incorporating or unitizing my acreage as part of the larger units that they were in the process of acquiring."). Plaintiff was subsequently unable to acquire additional

---

[1] As the two leases are identical, "*id.*" is used to refer to both documents.

surrounding acreage, as much of the property surrounding the Tracts was already leased or held by production.[2]  *See* [Doc. 42-6 at 29:8–19]; [Doc. 42-8 at 3].

At some point prior to August 22, 2013, having been unable to acquire additional acreage surrounding the Tracts, plaintiff approached defendant seeking either an extension of time in which to satisfy the Commitment or rescission of the Commitment altogether. [Doc. 42-8 at 3] (inquiring, on August 22, 2013, whether defendant had "come to any conclusion [on] our offer on the lease amendment"); [Doc. 42-3 at 41:9–42:12] (describing the negotiations).  When defendant refused to extend or remove the Commitment, plaintiff responded that in order to "hold the acreage," plaintiff would have "no choice" but to "go ahead and permit 2 Marcellus Horizontal wells that we will drill[,] very short horizontals . . . on these two tracts[.]"  *See* [Doc. 42-8 at 2–3].

Plaintiff did not begin preparing to drill the Tracts until March 26, 2013, when it hired an engineering firm to prepare its required drilling permit applications for submission to the West Virginia Department of Environmental Protection ("WVDEP").  *See* [Doc. 39-5 at 2] (engineering firm invoice for work beginning March 26, 2013); *see also* W.Va. Code § 22-6A-7(a) (requiring permit prior to commencement of well work).  In May 2013, plaintiff retained a surveying firm to survey, map, and stake the physical well locations on the leased property.  *See* [Doc. 39-6] (surveyor invoices for work beginning May 2013).

Plaintiff submitted its permit application for the first leased tract on June 14, 2013; however, on June 16, 2014, the WVDEP informed plaintiff that the application was being returned, as it was missing the performance bond required by the West Virginia Natural Gas Horizontal Well Control Act.  [Doc. 47-4 at 6]; *see also* W.Va. Code § 22-6A-7(g)

---

[2] The parties' differing explanations of this failure are irrelevant.

(requiring bond). Plaintiff submitted its permit application for the second leased tract on or about July 12, 2013,[3] once again without providing the required bond; that application was also returned to plaintiff. *See* [Doc. 47-4 at 7]; [Doc. 47-1 at 4].

On July 1, 2013, defendant sent plaintiff a notice of forfeiture indicating that defendant was cancelling the June 22, 2011 lease. *See* [Doc. 48-1]. Plaintiff states it has never received a similar notice concerning the August 1, 2011 lease. [Doc. 56 at 4]. Defendant's position, however, is that it had the right to declare both Leases forfeited based upon plaintiff's failure to satisfy the Commitment. *See* [Doc. 42 at 19].

**B.     The Top Lease**

On July 19, 2012—more than one month prior to the August 23, 2013 conclusion of negotiations between plaintiff and defendant concerning the Commitment—defendant executed a "top lease" leasing the Tracts to production company JB Exploration I, LLC, under which JB Exploration would acquire defendant's mineral interest in the Tracts on June 24, 2013. *See* [Doc. 38-11 at 2]. Defendant recorded a memorandum evidencing the top lease in the Tyler County Clerk's Office. *See id.* The July 19, 2012 top lease referenced in the memorandum, however, was not produced in discovery and has not been provided to this Court; the only document evidencing the top lease is the recorded memorandum.

The Leases between plaintiff and defendant contain the following provision

---

[3] The precise date the second application was filed is not clear from the record. Plaintiff's briefing represents it was filed on June 26, 2013, *see* [Doc. 40 at 4], but the application documents themselves state it was filed on July 19, 2013. *See* [Doc. 39-9 at 24]. However, a July 12, 2013 email from plaintiff to the WVDEP suggests that plaintiff sent the application prior to that date. *See* [Doc. 47-4 at 7] ("I understand that you received the permit applications . . .").

5

governing top leases:

> RIGHT OF FIRST REFUSAL: If at any time within 30 days of the expiration of the Lease's primary term . . . Lessor should receive a bona fide, acceptable offer to grant an additional lease ("Top Lease") for all or part of the subject premises, Lessor shall grant Lessee the option of meeting the terms and conditions of said offer. . . . Any Top Lease granted by Lessor in violation of this provision shall be null and void.

[Docs. 39-1 & 39-3 at 3]. Defendant neither informed plaintiff of the top lease nor offered plaintiff the option of meeting the terms and conditions of JB Exploration's offer.

Defendant represents that defendant and JB Exploration "mutually agreed to terminate" the July 19, 2012 top lease. [Doc. 47 at 10]. On September 20, 2013, however, defendant and JB Exploration executed a second top lease, which states that defendant "had received a 20% down payment in the amount of $124,185.50 for leasing JB [the Tracts] on July 19, 2012." [Doc. 39-12 at 2]. Again, defendant neither informed plaintiff of the top lease nor extended plaintiff a right of first refusal.

## II. Procedural History

Plaintiff initiated this action on June 24, 2013 by filing its Complaint [Doc. 1], invoking this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. The Complaint seeks a declaratory judgment that the Leases are valid and in full legal effect (Count I); that plaintiff satisfied the Commitment by submitting drilling permit applications for the Tracts (Count II); and that any top lease granted by defendant is void (Count III). On August 23, 2013, defendant filed its Counterclaim [Doc. 14 at 8–19] against plaintiff, alleging breach of contract (Count I); fraud (Count II); negligent misrepresentation (Count III); breach of the

implied covenant of good faith and fair dealing (Count IV); unjust enrichment (Count V); and slander of title (Count VIII). Defendant also seeks a declaratory judgment that plaintiff failed to satisfy the Commitment (Count VI) and to quiet title to the mineral rights associated with the Leases (Count VII).

On July 8, 2014, with the cross-motions for partial summary judgment pending, defendant filed its Amended Counterclaim [Doc. 59 at 8–22] pursuant to this Court's Order [Doc. 58] granting leave for defendant to do so. In addition to the counterclaims recited above, the Amended Counterclaim sets forth two additional claims for fraud (Count IX) and abuse of process (Count X). Thereafter, on July 17, 2014, plaintiff filed a Motion to Continue Trial and Modify Scheduling Order [Doc. 60], which this Court granted on July 18, 2014. [Doc. 64].

On September 4, 2014, this Court entered the first Order Granting in Part Denying in Part Cross-Motions for Partial Summary Judgment and Granting Plaintiff's Motion for Partial Dismissal of Defendant's Amended Counterclaims. [Doc. 67]. The Court ordered that the Leases remain valid (Plaintiff's Count I and Defendant's Count VII); the plaintiff's breached the Drilling Commitment (Plaintiff's Count II and Defendant's Count VI); and Ridgetop's top lease with JB Exploration were declared invalid. [Doc. 67]. This Court also dismissed the defendant's claim for breach of implied covenant of good faith and fair dealing (Count IV), claim for unjust enrichment (Count V) and abuse of process/ malicious prosecution claim (Count X).

As a result of the September 4, 2011, Order, the remaining defendant's counterclaims were fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), slander of title (Count VIII), and fraudulent misrepresentation in the pleadings

7

(Count IX). On November 3, 2014, Cunningham filed a Second Motion for Summary Judgment as for fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), slander of title (Count VIII), and fraudulent misrepresentation in the pleadings (Count IX). On November 12, 2014, the parties filed a joint stipulation of dismissal as to defendant's claim for slander of title (Count VIII) and fraudulent misrepresentation in the pleadings (Count IX). Subsequently, on November 24, 2014, the defendant filed its Response [Doc. 82] and on November 5, 2014 the plaintiff filed its Reply [Doc. 84].

### III. Legal Standard

#### A. Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Thus, a summary judgment motion should be granted if the nonmovant fails to make a showing sufficient to establish the existence of an essential element of his claim or defense upon which he bears the burden of proof. *Celotex*, 477 U.S. at 323. That is, once the movant shows an absence of evidence on one such element, the nonmovant must then come forward with evidence demonstrating there is indeed a genuine issue for trial. *Id.* at 323–24. The existence of a mere scintilla of evidence supporting the nonmovant's position is insufficient to create a genuine issue; rather, there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

### IV. Discussion

Due to the defendant's slander of title claim (Count VIII) and fraudulent misrepresentation in the pleadings claim (Count IX) being dismissed, this Court will now

consider the remaining claims for fraudulent misrepresentation (Count II) and negligent misrepresentation (Count III).

Before addressing the claims, this Court will briefly address whether the plaintiff's motion for summary judgment was timely filed. The defendant argues that, based on this Court's initial scheduling order, all dispositive motions were due by June 2, 2014 [Doc. 21]; thus, the defendant's second motion for summary judgment is untimely. [Doc. 82 at 4]. The defendant contends that the plaintiff did not have the right to file a second motion for summary judgment based on the Court's Modified Scheduling Order entered on July 18, 2014 [Doc. 64], because the deadlines in the Modified Scheduling Order only apply to the counterclaims added in the defendant's Amended Counterclaim [Doc. 82 at 4]. This Court disagrees. The plain language of the Modified Scheduling Order modifies the deadlines for all dispositive motions. The Order does not limit in any way the claims that can be filed, but sets new deadlines that apply for all dispositive motions. Therefore, the plaintiff's second motion for summary judgment was timely filed in compliance with the Modified Scheduling Order.

### A. Fraudulent Misrepresentation

With respect to the first issue, Ridgetop claims that Cunningham committed fraud when it entered into the Leases because Cunningham falsely stated that (1) the Oil and Gas of the subject Leases would be diligently developed; and (2) four horizontal wells would be drilled within twenty-four months of the execution of the subject Leases.

Under West Virginia law, the elements for fraudulent misrepresentation of a contract are: "the allegedly fraudulent act was committed by the defendant; the act was material and false; the plaintiff justifiably relied upon the act; and the plaintiff was damaged because he

9

relied upon it." ***White v. Nat'l Steel Corp.***, 938 F.2d 474, 490 (4th Cir. 1991) (citing ***Lengyel v. Lint***, 167 W. Va. 272, 276, 280 S.E.2d 66, 69 (1981)). The West Virginia Supreme Court of Appeals has expanded upon this definition by holding that a person does not have to make the statement with actual knowledge that it is false, provided that the person had a duty to know that it was true.

> Where one person induces another to enter into a contract by false representations which he is in a situation to know, and which it is his duty to know, are untrue, he, in contemplation of law, does know the statements to be untrue, and consequently they are held to be fraudulent, and the person injured has a remedy for the loss sustained by an action for damages. It is not indispensable to a recovery that the defendant actually knew them to be false.

***Folio v. City of Clarksburg***, 221 W. Va. 397, 404, 655 S.E.2d 143, 150 (2007) (citing Syl. Pt. 1, ***Horton v. Tyree***, 104 W. Va. 238, 139 S.E. 737 (1927)). The West Virginia Supreme Court has clarified that "[f]raud cannot be predicated on a promise not performed." ***Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP***, 231 W. Va. 577, 585, 746 S.E.2d 568, 576 (2013) (citing Syl. Pt. 3, ***Croston v. Emax Oil Co.***, 195 W. Va. 86, 87, 464 S.E.2d 728, 729 (1995)). The Supreme Court further explained that:

> [A]ctionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence. Somewhat similarly, it cannot be based on statements which are promissory in nature or which constitute expressions of intention, unless the non-existence of the intention to fulfill the promise at the time it was made is shown.

***Croston****,* 195 W. Va. at 90, 464 S.E.2d at 732.

In this case, Ridgetop has failed to point to one specific instance where Cunningham

10

committed fraudulent misrepresentation when entering into the Leases. Ridgetop's main contention is that Cunningham "failed to fulfill" its promise to drill the wells. [Doc. 82 at 7]. Specifically, Ridgetop contends that Cunningham failed to do research on the land surrounding the leased premises to determine if it was available to be leased. [Doc. 82 at 8]. However, Cunningham failing to properly plan does not amount to fraud. Joseph Blackhurst testified that although Cunningham was unsure if it would be able to obtain sufficient acreage to make a horizontal unit, Mr. Blackhurst believed that with the 312 acres being half a unit, that the company could make it work. [*See* doc. 42-6 at 34:6-14]. The fact that Cunningham was logistically unsure of where the unit would be located, does not mean that Cunningham had a "present intention not to perform" its Commitment. *See* **Walhonde Tools, Inc. v. Allegheny Energy, Inc.**, No. CIV A 206 0537, 2007 WL 1768714, at *4 n.3 (S.D. W.Va. June 15, 2007) (citing **Croston**, 195 W. Va at 90, 464 S.E.2d at 732)). The record does not support the fact that at the execution of the Leases, Cunningham knew that it would not be able to drill the wells.

Next, Ridgetop asserts that the email conversation between Cunningham's president, Ryan Cunningham, and Ridgetop's managing member, Bradley Carpenter, proves that Cunningham had no intentions of drilling the wells. [Doc. 82 at 8]. The email correspondence is consistent with Cunningham's representation that it attempted to acquire the contiguous property without success.[4] [42-3 at 42:9–43:5]. The defendant acknowledges this point in its first motion for partial summary judgment by stating that "it was [Mr. Carpenter's] understanding of Cunningham's intent in agreeing to the Drilling

---

[4] From Mr. Cunningham's testimony, he was not able to acquire the contiguous acres surrounding Ridgetop's property due to the company's investors withdrawing funding because of the dropping price of gas. *See* [Doc. 42-3 at 44:9–22].

Commitment was that Cunningham would acquire acreage adjacent to the Leased Premises to create production units of 640 acres." [Doc. 42 at 7; *see also,* Doc. 42-7 at 24:19–25:12]. The email correspondences fail to demonstrate Cunningham engaged in fraudulent misrepresentation.

Ridgetop's final contention is that Cunningham did not make a good faith effort to drill the wells because the surveying company and the engineering firm were hired a few weeks before the Leases expired. [Doc. 82 at 9]. This assertion does not support the defendant's contention that Cunningham had no intentions of drilling, but shows that Cunningham was willing to move forward with developing the Leases without a modification of the Commitment. Ridgetop has failed to prove that there is a question of fact as to the intentions of Cunningham; thus, Cunningham's second motion for summary judgment on fraudulent misrepresentation (Count II) is hereby **GRANTED**.

### B. Negligent Misrepresentation

As for the second issue, Ridgetop charges that Cunningham falsely represented that it would diligently develop the leased premises by drilling two horizontal Marcellus Shale wells within the first twenty-four months of the leases, and complete an additional two wells on each lease within twelve months after the completion of the first wells. [Doc. 82 at 10]. In particular, Ridgetop asserts that Cunningham should have known that it would not have been able to drill eight wells on the leased premises. [*Id.* at 10–11].

Pursuant to West Virginia law, a claim for negligent misrepresentation requires a plaintiff to establish that "a defendant represented a matter as being true, that the defendant had no knowledge of the truth of his representation, that the representation was false, and that the plaintiff relied on the false representation to his detriment." ***Kerns v.***

*Range Res. Appalachia, LLC*, No. 1:10CV23, 2011 WL 3753117, at *7 (N.D. W.Va. Aug. 23, 2011) (unreported) (citing *Folio v. City of Clarksburg*, 221 W. Va. 397, 405, 655 S.E.2d 143, 151 (2007)).  A plaintiff, however, "cannot maintain an action in tort for an alleged breach of a contractual duty." *Staats v. Bank of Am., N.A.*, No. 3:10-CV-68, 2010 WL 10899255 at *12 (N.D. W.Va. Nov. 4, 2010) (slip op.) (quoting *Lockhart v. Airco Heating & Cooling, Inc.*, 211 W. Va. 609, 614, 567 S.E.2d 619, 624 (2002)).  The West Virginia Supreme Court of Appeals ruled that "[t]ort liability of the parties to a contract arises from the breach of some positive legal duty imposed by law because of the *relationship of the parties*, rather than from a mere omission to perform a contract obligation." *Lockhart*, 211 W. Va. at 614, 567 S.E.2d at 624 (emphasis added).[5]  As the *Glascock* Court notes, "[t]he existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general." *Glascock v. City Nat. Bank of W. Virginia*, 213 W. Va. 61, 66, 576 S.E.2d 540, 545 (2002).

In the instant case, Ridgetop's claim does not amount to negligent misrepresentation because the claim stems from the breach of the Leases.  Without a duty or special relationship required by West Virginia law—independent from the breach of the Leases—Ridgetop has failed to prove that Cunningham had a special relationship which created a duty grounded in tort.  Accordingly, this Court **GRANTS** the plaintiff's Second

---

[5] The Supreme Court of Appeals of West Virginia discusses the "special relationship" in *Aikens v. Debow*, 208 W. Va. 486, 499, 541 S.E.2d 576, 589 (2000), *E. Steel Constructors, Inc. v. City of Salem*, 209 W. Va. 392, 398, 549 S.E.2d 266, 272 (2001), *Glascock v. City Nat. Bank of W. Virginia*, 213 W. Va. 61, 66, 576 S.E.2d 540, 545 (2002).

Motion for Summary Judgment pertaining to Count III.

## V. CONCLUSION

For the foregoing reasons, Plaintiff/Counterclaim-Defendant Cunningham Energy LLC's Second Motion For Summary Judgment is hereby **GRANTED**. **[Doc. 75]**.

It is so **ORDERED**.

The Clerk is directed to transmit a copy of this Order to counsel of record herein.

**DATED:** January 9, 2015

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE